Laurence GERARD and Firejet
America, Ltd., Appellees,

v.

Albert ALMOULI and Alchem,
Ltd., Appellants.

No. 1239, Docket 84–7121.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1984.

Decided Oct. 12, 1984.

Van Graafeiland, Circuit Judge, dissented and filed opinion.

Joseph H. Weiss, New York City (Morris Harary, New York City, of counsel), for appellants.

Howard Graff, New York City (Elaine Menlow, Sheryl Krongold, Block, Graff, Danzig, Jelline & Mandel, New York City, of counsel), for appellees.

Before OAKES, VAN GRAAFEILAND and PIERCE, Circuit Judges.

OAKES, Circuit Judge:

This is an appeal from the grant of a preliminary injunction requiring Albert Almouli and his company, Alchem, Ltd., to comply with the terms of a May 1978 agreement under which they granted an exclusive distributorship to Laurence Gerard and his company, Firejet America, Ltd., for "Firejet" fire extinguishers. The preliminary injunction was granted by the United States District Court for the Southern District of New York, Constance Baker Motley, Chief Judge. Almouli and Alchem appeal, and we affirm.

### FACTS

Firejet America, a Delaware corporation with its principal office in New York, is the assignee of Gerard's dealership and licensee rights under his agreements with the appellants. Almouli is a resident of Israel and inventor of the aerosol dispenser prototypes for Firejet extinguishers. Alchem, an Israeli corporation, manufactures, sells and distributes Firejet extinguishers, owning patent and trademark rights on its products and name in Israel, the United States, and elsewhere.

The Firejet extinguisher is a small-sized halogenated aerosol fire extinguisher designed to take the place of the bulkier, heavier, more difficult to use, carbon-dioxide fire extinguisher with which we are all familiar. The Firejet extinguisher is easily portable, being part of the equipment of the Israeli armed forces as well as other military and police forces around the world, by virtue of a new halon 1211 extinguishant that can be packed at a low pressure. The Firejet extinguisher weighs so little because the pressure it requires is equivalent to the pressure of a Coca-Cola bottle, in contrast to that of the old, carbon-dioxide extinguishers, which have to weigh three times as much as the extinguishant to contain the high pressure of the extinguishant. Although the Firejet extinguisher does not have Underwriters Laboratories (UL) approval, a matter to which we will allude further below, it has passed all but one UL test.

The parties started doing business with one another in 1977 and entered into the May 1978 agreement—an agreement dated May 15, 1978, but shortly thereafter modified slightly (the agreement)—which both parties recognize as controlling. Article 3 of the agreement names Gerard and Firejet America as exclusive distributor of and agent and licensee for the Firejet extinguisher in North America, South America, Central America, Germany and Japan. Gerard was to provide Alchem an immediate cash payment of $50,000 to help obtain UL listing—an obligation that Gerard has performed. A schedule outlined in Article 2 requires Gerard to place orders for extinguishers *"after* UL's listing is secured" (emphasis supplied). Alchem agreed that, upon placement of the first $100,000 order, Gerard would receive full worldwide sales and franchise exclusivity except as to Israel and that Gerard could manufacture the Firejet line outside Israel, paying royalties depending upon the amount of sales and subject to certain minimums. Under Article 18 of the agreement, Alchem agreed that if UL listing was not obtained within seven months, more or less, after the date of the agreement, Gerard would be "commissionable" to eight percent of all Alchem Firejet sales except in Israel, up to a maximum of $25,000.

UL listing, a key to the agreement, is approval by the nonprofit independent testing agency whose standards are incorporated into many fire codes and referenced in the *Fire Protection Handbook,* said to be "the Bible" on fire prevention. The Handbook says that "only extinguishers which have been rated by the testing laboratories [UL] should be purchased, because otherwise it is difficult to know whether an extinguisher is reliable and effective." UL listing is not only considered by experts and the public to be an indication of safety, quality control, and reliability, but it is also required by many cities and states, branches of the military, and virtually all major retailing chains. Nevertheless, UL listing means very little, if anything, outside the United States. After six years Alchem has

not yet obtained UL approval, not necessarily because of changing standards or because of the product, but simply because it is not unusual for UL approval to take this long a time—it is usually a minimum of three years and goes as high as fifteen. Apparently the product has been approved for sale, not only in Israel, but also in England, Switzerland, Greece, Israel, Japan, Korea and Singapore. Some $140,000 has been spent to obtain UL approval.

At the same time, while Firejet America has not sold any fire extinguishers, it has been preparing for sales, contacting customers and public authorities, and submitting prototype extinguishers to UL for testing.

Alchem claims that Gerard and Firejet America have not used good faith or their best efforts to sell the product and, thus, have breached implied covenants under common law and section 2–306 of the Uniform Commercial Code.[1] The claim is that Gerard and Firejet America have not used their best efforts to sell Firejet extinguishers in exclusive distributorship territories where UL certification is not recognized or required. In connection with this claim it is suggested that, because the agreement is silent about appellees' obligations if UL certification is not obtained, parol evidence is admissible to show their lack of good faith and best efforts. Appellants also argue that they are entitled to relief from a mutual mistake concerning the obtainability of UL certification, because the parties contemplated UL certification within six to seven months when, in fact, it is usually

obtained in a minimum of three years and a maximum of fifteen years.[2]

The district court held that Firejet America was not required to purchase any extinguishers until UL approval was obtained and that the UL listing was an important, bargained-for feature of the agreement. The court further found that Alchem in 1980 attempted to terminate the agreement and subsequently sold non-UL-listed extinguishers in Firejet America's exclusive territory; that Alchem failed to provide certain relevant sales information to Firejet America under Article 12 of the agreement; and that Alchem failed to pay Firejet America the $25,000 required under Article 18 of the agreement when UL approval took longer than the seven months, more or less, specified.

On the basis of these facts, the court held that, because Articles 2 and 18 of the agreement were clear and unambiguous with respect to the parties' obligations, no parol evidence concerning the parties' intentions was admissible; that the agreement did not require appellees to make sales prior to Alchem's success in obtaining UL listing; that there was no mutual mistake of fact concerning the obligation to obtain the UL listing; that Article 18 of the agreement is not a termination clause; and that UL approval "is the bargained-for standard." The court then granted a preliminary injunction to Gerard and Firejet America on the basis of *Jackson Dairy v. H.P. Hood & Sons*, 596 F.2d 70 (2d Cir. 1979).

---

1. A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sales. U.C.C. § 2–306(2). The official comment to § 2–306 reads as follows:

   Subsection (2), on exclusive dealing, makes explicit the commercial rule embodied in this Act under which the parties to such contracts are held to have impliedly, even when not expressly, bound themselves to use reasonable diligence as well as good faith in their performance of the contract. Under such contracts the exclusive agent is required, al-

   though no express commitment has been made, to use reasonable effort and due diligence in the expansion of the market or the promotion of the product, as the case may be. *Id.* comment (5).

2. Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154. Restatement (Second) of Contracts § 152(1) (1981).

## DISCUSSION

■ Under the good faith and best efforts requirements of New York law, *Feld v. Henry S. Levy & Sons, Inc.,* 45 A.D.2d 720, 356 N.Y.S.2d 336 (2d Dept.1974), *aff'd,* 37 N.Y.2d 466, 373 N.Y.S.2d 102, 335 N.E.2d 320 (1975); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 281 N.E.2d 142 (1972); U.C.C. § 2–306, the district court's finding that Firejet America had no obligation to sell non-UL-approved extinguishers is conclusive if not clearly erroneous. We agree with the district court that the contract anticipates that all sales are preconditioned on UL approval and that there is no question but that appellees satisfied whatever obligations they had to prepare for sales subsequent to UL approval.

Put another way, because the contract sets out explicit sales requirements, none of which applied *before* UL approval, it would be improper to read into the contract a contradictory sales requirement. *See Cross Properties, Inc. v. Brook Realty Co.,* 76 A.D.2d 445, 430 N.Y.S.2d 820 (2d Dep't 1980). Indeed U.C.C. § 2–306 requires the use of best efforts "unless [an] otherwise agreed upon" standard is set forth in the contract. *See also* U.C.C. § 1–102(3) (same as to good faith standard).

■ Appellants' parol evidence argument falls by virtue of the same finding. As the district court found, the agreement explicitly outlines Firejet America's obligations, which come into play only after UL approval has been obtained. Since the contract states Firejet America's obligations, parol evidence is not admissible to increase those obligations.

■ The argument of appellants based on mutual mistake likewise fails once it is realized that the contract made explicit provisions for the possibility that UL approval would take longer than seven months—namely, under Article 18 as amended, Firejet would get up to a $25,000 refund on its $50,000 payment if approval were not forthcoming within seven months, more or less. Here as in *Leasco Corp. v. Taussig,* 473 F.2d 777, 781–82 (2d Cir.1972), the contract was entered into on the known assumption of a doubtful fact.

■ We also believe that the district court satisfied the Second Circuit's two-pronged test for granting a preliminary injunction. The likelihood of irreparable harm was demonstrated since appellees' damages may not be quantified. The district court found, based upon the testimony of a Philadelphia Deputy Fire Chief who appeared on the "Good Morning America" show, that non-UL-approved extinguishers (said by appellants to be obsolete models of their products) were defective. The Firejet extinguisher received some unhappy adverse publicity as a result of the television show. Because no developed market for this product existed and because sales by appellants would not fairly indicate potential sales by appellees with their sales expertise and a UL-approved product, it would be impossible to produce an accurate money damages figure. *See, e.g., Danielson v. Local 275, Laborers Int'l Union,* 479 F.2d 1033 (2d Cir.1973). As for the second prong of the *Jackson Dairy* test, the district court's legal analysis is sound; appellees have a likelihood of success on the merits.

We note that the preliminary injunction requires Almouli and Alchem not to sell, distribute "price to or do business with" anyone other than Gerard and Firejet America in any of the exclusive distributorship territories. This, of course, means that Alchem cannot sell its extinguishers even in those countries that do not require UL approval, until such approval is had. In the interests of equity, on remand, the court may wish to reconsider—and our holding leaves such reconsideration open—the respective duties and obligations of the parties pending UL approval as to those countries in which such approval is meaningless, in view of the length of time that has expired without approval. Of course, it is open to the parties themselves to re-

consider and rewrite their agreement in that respect.

Judgment affirmed.

VAN GRAAFEILAND, Circuit Judge, dissenting:

This is an appeal from a preliminary injunction order which directed appellees to "comply with the terms of the May 1978 Agreement" and, specifically, "to respect [appellants'] exclusive distribution and licensing rights in North America, South America, Japan, Germany, and Central America." Although there is a substantial question whether this Court should give its stamp of approval to an order that so clearly violates Fed.R.Civ.P. 65(d); *see Diapulse Corporation of America v. Carba, Ltd.*, 626 F.2d 1108, 1111 (2d Cir.1980), it is the propriety rather than the form of the order that prompts this dissent.

An injunction order is "the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages." *Detroit Newspaper Publishers Association v. Detroit Typographical Union No. 18, International Typographical Union*, 471 F.2d 872, 876 (6th Cir.1972) (quoting 3 Barron & Holtzoff, *Federal Practice and Procedure* (Wright ed.) § 1431, now 11 Wright & Miller § 2942), *cert. denied*, 411 U.S. 967, 93 S.Ct. 2149, 36 L.Ed.2d 687 (1973). It is "an extraordinary and drastic remedy which should not be routinely granted." *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977); *see Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 (2d Cir.1979). It should not have been granted in the absence of a clear and plain showing of irreparable injury, *i.e.*, "the absence of an adequate remedy at law, which is the sine qua non for the grant of such equitable relief." *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir.1981); *see United States Postal Service v. Brennan*, 579 F.2d 188, 191 (2d Cir.1978). Appellees have failed to make any showing that sales of appellants' extin-

guisher bearing no UL label ("unlabeled") in countries such as Argentina, Brazil, and Japan will cause appellees irreparable injury.

Unlabeled halogenated aerosol extinguishers similar to appellants' have been on the market for twenty years, and hundreds of thousands of aerosol units containing Halon 1211 are being sold annually throughout the world. Indeed, one device now being produced in Canada was stated without contradiction to be an "exact duplicate" of appellants' extinguisher. Appellees' counsel assured Chief Judge Motley time and again that appellees did not challenge the safety of appellants' unlabeled product. Judge Motley's response to these repeated assurances was that there was no need for appellants to prove the conceded safety of their extinguisher. In view of (1) concessions by court and counsel of product safety, (2) the undisputed testimony that appellants' extinguisher had passed more than fifty UL tests and only one test remained to be given, (3) the undisputed expert testimony that appellants' product, which meets Department of Transportation standards, presently is safe, and (4) the submission by appellees to UL of an extinguisher patterned after appellants' and "almost identical" with it, Judge Motley clearly erred in basing a finding of irreparable harm upon the sale by appellants of "defective" extinguishers.

Moreover, a finding of irreparable harm cannot be predicated upon the asserted impossibility of producing an accurate money damages figure. "Damages are not rendered uncertain because they cannot be calculated with absolute exactness." *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927), *quoting with approval the court below*, 295 F. 98, 102 (5th Cir.1923). Their extent may be established "as a matter of just and reasonable inference, although the result be only approximate." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931). In *Perma Research & Development v. Singer*

*Co.,* 542 F.2d 111, 115–16 (2d Cir.), *cert. denied,* 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976), for example, this Court affirmed an award of $7,000,000 based on the defendant's failure to perfect a novel nonskid device which, at the time of the award, still was neither perfected nor marketable. *See also Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 455–56 (2d Cir.1977); *Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 563–67 (2d Cir.1970). Chief Judge Motley found that appellants' extinguisher is not unique and that extinguishers similar to appellants' are being sold in a number of countries. There is no reason why, assuming a breach of contract, an adequate award of damages could not be made in this case.

Although my colleagues affirm the granting of equitable relief, they realize apparently that the result is not an equitable one. I agree. I also doubt that it represents the intent of the contracting parties.

The contract is an open-ended one, automatically renewable for one-year periods so long as none of its conditions has been violated. The district court held that the contract does not require appellees to make sales anywhere in the world prior to appellants' success in obtaining UL listing in the United States and that the parties did not contemplate that such listing would be obtained in a short period of time. This means that, if appellants are unable to secure UL listing within ten years, fifteen years, or perhaps an even longer period, appellees, without lifting a finger, may preclude appellants from selling unlabeled extinguishers anywhere in North America, South America, Central America, Japan, or Germany.

The district court was quite correct in holding that the contract did not expressly impose any duties upon appellees prior to UL listing. The contract provides simply that appellees are required to place orders for specified quantities of extinguishers "after UL's listing is secured." The contract does not state, however, that appellees have no obligations whatsoever prior to such listing. In fact, it says nothing. The district court should have received parol evidence on this subject if only to determine whether the parties intended that appellees' obligations with respect to foreign sales during the pre-listing period should be governed by the "best efforts" provision of section 2–306(2) of the Uniform Commercial Code. *See Hunt Foods and Industries, Inc. v. Doliner,* 26 A.D.2d 41, 42–43, 270 N.Y.S.2d 937 (1st Dept.1966); *George v. Davoli,* 91 Misc.2d 296, 298–99, 397 N.Y.S.2d 895 (1977); U.C.C. § 2–202(b).

It is interesting to note that, although appellees' notice of motion for a temporary injunction asked that appellants be precluded from selling their extinguisher in any of appellees' territories, the affidavit submitted in support of the motion by appellee Laurence Gerard, Firejet's president, asked only that appellants be enjoined from making sales in the United States. Indeed, the parties were well into the hearing before the district court realized that appellees were seeking more wide ranging relief.

Without some time limitation, it borders on the unconscionable, *see* U.C.C. § 2–302, to hold that, although appellees are not obligated to sell and do not sell appellants' unlabeled fire extinguishers in such places as Brazil or Japan, they may at the same time prevent appellants from selling them there. Article 18 of the contract provides that, if UL approval is not obtained within seven months, more or less, appellees are "commissionable" to eight percent of all appellants' sales, except in Israel, up to a maximum of $25,000. This paragraph appears to contemplate worldwide sales by appellants after six or seven months have gone by without listing. At the very least, it creates an ambiguity that mandates clarification by parol evidence.

Because the district court refused to receive any parol evidence, because the essential requirements for injunctive relief are lacking, and because an equitable device is being used to produce an inequitable result, I respectfully dissent.